# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## LESLIE ANN RICHARD (GOFF) v. DAVID WAYNE RICHARD

**Direct Appeal from the Chancery Court for Cheatham County**
**No. 8797     Robert E. Burch, Chancellor**

---

**No. M1999-02797-COA-R3-CV - Decided May 25, 2000**

---

This appeal involves a contentious dispute over the custody of a five-year-old child. Six months after the Chancery Court for Cheatham County awarded custody of the child to her mother, the child's father filed a petition to change custody because the mother's boyfriend was living with the mother and child. Following a bench trial, the trial court changed custody from the mother to the father. The mother has appealed from this decision. We have determined that the order granting the father custody of the child should be reversed because the evidence preponderates against the finding that there was a material post-divorce change in the child's circumstances that warranted a change in the custody arrangement.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

KOCH, J., delivered the opinion of the court, in which HIGHERS, J., and FARMER, J., joined.

John M. L. Brown, Nashville, Tennessee, for the appellant, Leslie Ann Richard (Goff).

Jennifer Davis Roberts, Dickson, Tennessee, for the appellee, David Wayne Richard.

### OPINION

David Wayne Richard and Leslie Ann Goff (formerly Richard) married on February 12, 1994. Mr. Richard was twenty-four years old and had never been married before. Ms. Goff, six years Mr. Richard's senior, had been married twice before and had three children. Their child, Courtney, was born on May 16, 1995.

The parties separated in July 1996, and Ms. Goff and Courtney remained in the marital home by agreement. On August 2, 1996, Ms. Goff filed for divorce in the Chancery Court for Cheatham County. Mr. Richard later counterclaimed for divorce and sought temporary custody of his daughter because Ms. Goff was "cohabitating with her paramour . . . in the parties [sic] marital home" and

because Ms. Goff was interfering with his visitation.[1]  Following a hearing in February 1997, the trial court filed an order on March 24, 1997, declaring the parties divorced "without an assignment of fault" and awarded custody of the child to Ms. Goff.  The trial court based its custody decision on "the relationship of the step-siblings, the Father's uncertain living arrangements, and his lack of a driver's license."  The trial court found "that the parties' parenting skills are even and it does not place any emphasis on [Ms. Goff's] prior relationship as the Court feels she has learned a lesson from it."

Ms. Goff and the child lived in the marital home until it was sold.  When she moved out, Ms. Goff told Mr. Richard that she and the child would be living in Kingston Springs with Barbara and Arthur Hummell, her mother and step-father.  Mr. Richard later hired a private investigator who discovered that Ms. Goff was actually living in Nashville.[2]  The private investigator also discovered that Ms. Goff was, on occasion, spending the night at the home of her then boyfriend, Michael Goff, and that when she did, she was leaving Courtney in the custody of her step-sisters, the oldest of whom was sixteen.[3]  In addition, Mr. Goff was also spending the night at Ms. Goff's home while the children were present.[4]  Armed with this information, Mr. Richard filed petitions on September 30, 1997, seeking temporary custody and for a change in the permanent custody arrangement.

Within one month after Mr. Richard filed his custody petitions, the specter of child abuse raised its ugly head.  Mr. Richard discovered that Courtney's feet were bruised and puffy while exercising his visitation on October 22, 1997.  He contacted Ms. Goff and the daycare personnel who professed ignorance about the condition or how it occurred.  Thereafter, Mr. Richard took his daughter to a walk-in clinic where a physician's assistant treated her for an allergic reaction.  Ms. Goff took the child to her regular pediatrician the following day.  The pediatrician suspected child abuse and recommended that Ms. Goff contact the Department of Children's Services ("DCS").[5]  Ms. Goff did so, and a DCS caseworker came to the pediatrician's office to interview Ms. Goff and the pediatrician and to examine Courtney.

---

[1]The record contains no indication that Mr. Richard ever pursued, or that the trial court ever acted upon, the motion for temporary custody.

[2]Ms. Goff later testified that she did not tell Mr. Richard where she was living for "reasons [of] harassment.  I didn't know where he was living."  Under cross-examination, she admitted that Mr. Richard has not harassed her, and that she had Mr. Richard's telephone number because he had left it with her mother when he tried to call her.

[3]Ms. Goff denied spending an entire night at Mr. Goff's home until she began cohabiting with him in March, 1998.  However, Mr. Goff's testimony verified that Ms. Goff would sometimes spend the night with him, leaving her children at home.

[4]Ms. Goff and Mr. Goff eventually began living together and were married October 21, 1998, one day before the hearing on Mr. Richard's motion for temporary custody.

[5]Ms. Goff initially testified that the physician contacted the DCS.  Under cross-examination, she admitted that she contacted the DCS but stated that the physician suggested this.

After consulting with his supervisor, the DCS caseworker recommended that Mr. Richard and Ms. Goff assent to a "Safety Plan Agreement" to ensure Courtney's safety while DCS conducted its investigation. This plan provided that the child would remain with Ms. Goff "until such time as the [DCS] deems such an arrangement is no longer necessary" and also provided that Mr. Richard would not exercise visitation while the agreement was in effect. It also stated that "[i]t is understood this placement is arranged by agreement of all parties . . ." and that "this is an informal agreement and is not legally binding."[6] The caseworker's supervisor instructed him to present the "Safety Plan Agreement" to Mr. Richard with a request that he sign it and voluntarily refrain from exercising his visitation rights. Disregarding these instructions, the caseworker obtained Ms. Goff's agreement but did not obtain Mr. Richard's agreement. The caseworker also told Ms. Goff that she should deny Mr. Richard visitation with Courtney.

When Mr. Richard attempted to exercise his visitation rights on October 31, 1997, Ms. Goff, relying on her understanding of the Safety Plan Agreement, refused to permit Courtney to leave with him. Ms. Goff's step-father eventually asked Mr. Richard to leave the property.[7] Before Mr. Richard's next scheduled visitation, his lawyer and the DCS agreed to the entry of an order by the Davidson County Juvenile Court reinstating Mr. Richard's visitation. Unfortunately, the DCS did not inform either Ms. Goff or its own caseworker of this development. Thus, when the time came for Mr. Richard's next scheduled visitation, Ms. Goff again declined to permit him to visit with the child. When Mr. Richard presented her with a copy of the juvenile court order reinstating his rights, Ms. Goff telephoned the DCS for advice. The caseworker informed her that he knew nothing about the order and that she should adhere to the terms of the safety plan until he could find out what was going on. By the time the caseworker contacted his supervisor, it was too late for Mr. Richard's visitation.

The child abuse investigation ended in June 1998 when a juvenile court referee entered an order concluding that the bruising on Courtney's feet was "the result of non-accidental trauma most likely cause [sic] by squeezing or other similar pressure to her feet (as opposed to a blunt striking force)." The referee concluded that the bruising occurred some time after the child awoke on the morning of October 22, 1997, but was unable to pinpoint precisely when it occurred that day. Accordingly, the juvenile court could not determine who caused the bruising.[8] Noting that the parties' animosity toward each other was having a detrimental effect on their daughter, the referee

---

[6]The safety plan also warned that "should the conditions of this agreement be violated, the safety plan will be revoked and DCS may have cause to petition for custody and emergency removal of the children."

[7]The step-father was apparently attired for Halloween during this incident because he was dressed entirely in black and was wearing a visible, holstered pistol on his side.

[8]Courtney could have been injured while at the home of her mother, on the way to the daycare center, at the daycare center, or after Mr. Richard picked her up from daycare.

ordered both parents to participate in post-divorce counseling. In addition, it ordered Mr. Richard to attend counseling "to address what the Court finds as Mr. Richard's need to learn appropriate anger management in dealing with other people."

On October 22, 1998, the trial court conducted a hearing regarding Mr. Richard's motion for temporary custody. This hearing highlighted Mr. Richard's anger management problem as well as Ms. Goff's efforts to undermine Mr. Richard's relationship with Courtney.[9] In addition, both Mr. Goff and Ms. Goff testified that they had married on the previous evening and that they intended to move into a house they had built in Franklin shortly after the hearing. While they conceded that the timing of their wedding was not entirely coincidental, they asserted that they had been intending to get married for some time.

On November 18, 1998, the trial court denied Mr. Richard's motion for temporary custody. The court determined that a material change in circumstances had occurred because (1) Ms. Goff had been "untruthful in her testimony in the original case and in her testimony today," (2) she had made no effort to create an atmosphere conducive to amicable visitation, and (3) she had exhibited little regard for the court's orders. The trial court also observed that Ms. Goff had a casual attitude toward morals. Nonetheless, the trial court declined to change custody pending the final hearing because there was no imminent threat to the child's welfare.[10] The court also set the hearing on permanent custody for February 11, 1999.[11]

The relationship between Ms. Goff and Mr. Richard continued to deteriorate during the three months leading up to the hearing on Mr. Richard's petition for a permanent change of custody. Ms. Goff again contacted DCS alleging child abuse when Courtney came home with a bruised leg after visitation with Mr. Richard.[12] In early November, Mr. Richard had a heated confrontation with Mr.

---

[9]Mr. Richard testified that the child sometimes called herself "Courtney Nicole Goff" and referred to Mr. Goff as "Daddy." Mr. and Ms. Goff both testified that they had not encouraged Courtney to use these names and that she had started using them on her own.

[10]Speaking from the bench, the trial court stated that "there is no reason to change custody on -- I hate -- I hesitate to use the word emergency -- I don't think it has to be an emergency -- an expedited basis, short-cutting the legal system short of a trial. . . . Main thing is you just want to keep from having to change back and forth, back and forth. Hold it until we know what we are dealing with, and then go from there."

[11]The trial court also found that Ms. Goff was in criminal contempt for her October 31, 1997 refusal to permit Mr. Richard to have visitation with Courtney. The court stated that it was aware that Ms. Goff's action was prompted by advice from the DCS caseworker but added that "[a]ll that does is create a cell mate." Accordingly, the court appointed a special prosecutor to pursue criminal contempt sanctions against the DCS caseworker and his supervisor.

[12]Mr. Richard testified that the child fell at a Vanderbilt football game. His account of the
(continued...)

Goff when he arrived at the Goff home to pick up Courtney for visitation. According to Mr. Richard, Mr. Goff came outside, shut the door behind him, and became physically threatening and verbally abusive to Mr. Richard. Ms. Goff later asserted that she was not aware of this confrontation until after Mr. Goff came back into the house.

The trial court conducted a final hearing on February 11, 1999, regarding Mr. Richard's petition to change custody. With the parties' agreement, the trial court based its decision on the evidence presented during this hearing as well as the evidence presented at the October 22, 1998 hearing on temporary custody. The trial court concluded that a material change in the child's circumstances had occurred since its March 24, 1997 divorce decree and that Mr. Richard should be awarded permanent custody of the parties' child. The trial court reasoned as follows:

> Prior to the October [22, 1998] hearing, Ms. Goff performed poorly as a parent. Since that hearing, she has cleaned up her act considerably, and, essentially, she is now doing all the right things. Had she been conducting herself in this fashion all along, a petition to change custody would never have been given a chance.

> The controlling issue before the court is whether Ms. Goff's change in behavior is genuine. If it is genuine, it is likely to continue in the future and, if not, then she will revert back to her previous lifestyle. There is no way to determine this issue other than by instinct and common sense, based on the proof presented.

> Ms. Goff still exhibits manipulative behavior and untruthfulness, although she is now more subtle. For example, the court does not believe that Ms. Goff was unaware of the encounter between Mr. Goff and Mr. Richard on the front porch of the Goffs' residence.

> If here are any further problems during visitation exchanges, the court will act decisively to stop them. The parties must be civil to each other in order to make the visitation exchange work. If there is another incident such as the one between Mr. Goff and Mr. Richard, then the court is going to start putting people in jail.

> The proof adduced at the hearing on October 22, 1998, established that a significant and material change in circumstances occurred since the entry of the final decree. Specifically, the change

---

[12](...continued)
incident was echoed by a friend who had attended the game with Mr. Richard and his daughter. Nothing had come of these allegations by the time of the final hearing in February 1999.

of circumstances was that Ms. Goff engaged in a lifestyle of leaving the children alone all night and so on and so forth. That being the case, then everybody goes back to level ground and the court determines what is in the best interest of the child. This is an attempt to try to figure out where the child is going to be better off.

Based on all the foregoing, the court is of the opinion – and the court has to admit that there is only instinct involved here – that Ms. Goff's change in behavior is not genuine, but is a further attempt to manipulate the situation. The court believes that she will revert to her prior practices as time passes, and this would not be beneficial to the child. The court is of the opinion that it is not in the best interest of the child to stay with Ms. Goff, and the court therefore concludes that custody should be changed to Mr. Richard. Child support will be set according to the guidelines, and visitation will be the mirror image of what it has been under the prior orders of the court.

The trial court also directed that Ms. Goff, as punishment for her criminal contempt, be taken to the Cheatham County jail, locked momentarily in a cell, and then returned to the courtroom. Ms. Goff appeals from the portion of the order changing permanent custody to Mr. Richard.

# I.

Ms. Goff has mounted a four-prong attack on the trial court's decision to change custody. First, she asserts that the evidence preponderates against the conclusion that the child's circumstances had changed so materially since the entry of the March 24, 1997 divorce decree that the question of the custody of the parties' child should be reopened. Second, she argues that even if the circumstances had materially changed, she remains comparatively more fit to be the child's custodian. Third, she insists that the trial court used its custody decision to punish her for conduct the court found offensive. Finally, she takes the trial court to task for basing its decision on "instinct" and on her possible future misconduct.

# A.

The child's best interests are at the heart of every custody decision. The purpose of a custody decision is, to the greatest extent possible, to promote the child's relationship with both parents and to interfere as little as possible with post-divorce family decision making. *See Geiger v. Boyle*, No. 01A01-9809-CH-00467, 1999 WL 499733, at *2 (Tenn. Ct. App. July 16, 1999) (No Tenn. R. App. P. 11 application filed). These decisions are not intended either to reward or to punish parents. *See Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997); *Turner v. Turner*, 919 S.W.2d 340, 346 (Tenn. Ct. App. 1995). In fact, the courts have noted repeatedly that the interests of the child are paramount to the desires of the parents. *See Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986).

Initial custody decisions call for the courts to determine which of the parents competing for custody is comparatively more fit. This "comparative fitness" analysis does not measure the parents against the standard of perfection because the courts are pragmatic enough to understand that perfection in marriage and parenting is as evanescent as it is in life's other pursuits. *See Rice v. Rice*, 983 S.W.2d 680, 682-83 (Tenn. Ct. App. 1998); *Julian v. Julian*, M1997-00236-COA-R3-CV, 2000 WL 343817, at *6 (Tenn. Ct. App. Apr. 4, 2000) (No Tenn. R. App. P. 11 application filed). Rather, the analysis requires the courts to determine which of the parents, in light of their present circumstances, is comparatively more fit to assume and discharge the responsibilities of being a custodial parent. *See In re Parsons*, 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995).

Because of the importance placed on stability and continuity of placement,[13] there is a strong presumption in favor of an existing custody decision. *See Taylor v. Taylor*, 849 S.W.2d at 332; *Smithson v. Eatherly*, No. 01A01-9806-CV-00314, 1999 WL 548586, at *3 (Tenn. Ct. App. July 29, 1999) (No Tenn. R. App. P. 11 application filed). In fact, a custody decision, once made and implemented, is res judicata upon the facts in existence or reasonably foreseeable when the decision was made. *See Adelsperger v. Adelsperger*, 970 S.W.2d at 485.

Life in contemporary society is, however, rarely static. Accordingly, our statutory and decisional law empowers the courts to alter custody arrangements when intervening circumstances require modifications. *See* Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 1999) (stating that custody decrees are "subject to such changes or modification as the exigencies of the case may require"). Thus, the courts may modify an existing custody arrangement when required by unanticipated facts or subsequently emerging conditions. *See Smith v. Haase*, 521 S.W.2d 49, 50 (Tenn. 1975); *Adelsperger v. Adelsperger*, 970 S.W.2d at 485. In the interests of stability in the child's life, a court should not alter an existing custody arrangement until (1) it is satisfied that the child's circumstances have changed in a material way since the entry of the presently operative custody decree, (2) it has carefully compared the current fitness of the parents to be the child's custodian, and (3) it has concluded that changing the existing custody arrangement is in the child's best interests. *See Gorski v. Ragains*, 1999 WL 511451, at *3.

There are no bright line rules for determining when a change of circumstances will be deemed material enough to warrant changing an existing custody arrangement. *See Taylor v. Taylor*, 849 S.W.2d at 327; *Solima v. Solima*, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998). These decisions turn on the unique facts of each case. As a general matter, however, the following principles illuminate the inquiry. First, the change of circumstances must involve the child's circumstances rather than those of either or both parents. *See White v. White*, No. M1999-00005-COA-R3-CV, 1999 WL 488477, at *3 (Tenn. Ct. App. Dec. 10, 1999) (No Tenn. R. App. P. 11 application filed); *McCain v. Grim*, No. 01A01-9711-CH-00634, 1999 WL 820216, at *2 (Tenn. Ct. App. Oct. 15, 1999) (No

---

[13] *See Taylor v. Taylor*, 849 S.W.2d 319, 328 (Tenn. 1993); *Gorski v. Ragains*, 01A01-9710-GS-00597, 1999 WL 511451, at *4-5 (Tenn. Ct. App. July 21, 1999) (No Tenn. R. App. P. 11 application filed); *see also* National Interdisciplinary Colloquium on Child Custody, *Legal and Mental Health Perspectives on Child Custody Law: A Deskbook for Judges* § 5:1, at 51 (1998).

Tenn. R. App. P. 11 application filed). Second, the changed circumstances must have arisen after the entry of the custody order sought to be modified. *See Turner v. Turner*, 776 S.W.2d 88, 90 (Tenn. Ct. App. 1988). Third, the changed circumstances must not have been reasonably anticipated when the underlying decree was entered. *See Adelsperger v. Adelsperger*, 970 S.W.2d at 485. Fourth, the circumstances must affect the child's well-being in some material way. *See Geiger v. Boyle*, 1999 WL 499733, at *3; *Dalton v. Dalton*, 858 S.W.2d 324, 326 (Tenn. Ct. App. 1993).

## B.

We now turn to what we believe to be the pivotal issue in this case – whether the evidence preponderates against the trial court's conclusion that there had been a material change in the child's circumstances that required a change in custody after the March 24, 1997 divorce decree. The only factual circumstance mentioned by the trial court to support its conclusion was "that Ms. Goff engaged in a lifestyle of leaving the children alone all night and so on and so forth." Based on our de novo review of the entire record, this conduct, which occurred in early to mid-1997, does not warrant triggering a review in 1999 of the custody arrangement.

Courts may appropriately consider a custodial parent's non-marital sexual activities in the context of a custody decision. *See Lance v. Lance*, No. 01A01-9801-CV-00036, 1998 WL 748283, at *3 (Tenn. Ct. App. Oct. 28, 1998) (No Tenn. R. App. P. 11 application filed); *Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App. 1991). However, we have repeatedly pointed out that cohabitation alone does not necessarily provide grounds for changing custody when there is no proof that it has or will adversely affect the children. *See Varley v. Varley*, 934 S.W.2d 659, 666-67 (Tenn. Ct. App. 1996); *Sutherland v. Sutherland*, 831 S.W.2d 283, 286 (Tenn. Ct. App. 1991).[14] This is particularly true when the custodial parent has married the paramour by the time of the hearing. *See Smith v. Smith*, No. 87-128-II, 1987 WL 17407, at *4 (Tenn. Ct. App. Sept. 25, 1987) (No Tenn. R. App. P. 11 application filed).

Ms. Goff's relationships with men to whom she was not married have not sat well with the trial court throughout these proceedings. However, by the time of the February 11, 1999 hearing, Ms. Goff had married Mr. Goff and they had moved into a new home in Franklin. Thus, there was no longer any need for her to spend entire nights away from her children in order to cohabit with Mr. Goff. Even the trial court noted that Ms. Goff had "cleaned up her act considerably" and that she was "now doing all the right things." Accordingly, we find that Ms. Goff's cohabitation with Mr. Goff in 1997 was not a change of circumstances sufficient to trigger a reconsideration of the custody arrangement that had been in place since 1997.

---

[14]*See also Williams v. Williams*, No. 01A01-9610-CV-00468, 1997 WL 272458, at *6-7 (Tenn. Ct. App. May 23, 1997) (No Tenn. R. App. P. 11 application filed); *Salimbene v. Salimbene*, No. 87-194-II, 1987 WL 27748, at *1 (Tenn. Ct. App. Dec. 16, 1987) (No Tenn. R. App. P. 11 application filed); *Smith v. Smith*, No. 86-43-II, 1986 WL 7621, at *2 (Tenn. Ct. App. July 9, 1986) (No Tenn. R. App. P. 11 application filed) (reversing a decision to remove two children from the custody of a mother who admitted to having sexual relations with four different men during the first three years following the divorce).

We have examined the record to determine whether it contains any other evidence of a material change in Courtney's circumstances that could have provided a basis for reopening the issue of custody. We have found nothing else in the child's circumstances that could not have been reasonably foreseen when the divorce decree was entered on March 24, 1997. These parties have been carrying the battle to each other ever since their separation in July 1996. Mr. Richard assaulted Ms. Goff's morals, and Ms. Goff responded by frustrating Mr. Richard's visitation. Their animosity usually flared up during visitation exchanges. After observing this bickering for over three years, the trial court finally warned both parties that they "must be civil to each other in order to make the visitation exchange work" and to warn that it would "start putting people in jail" if the conduct continued.

The evidence regarding interference with visitation and the normal development of the relationship between Mr. Richard and his daughter is of concern. This sort of conduct can be considered in the context of a custody decision. *See* Tenn. Code Ann. § 36-6-106(10) (Supp. 1999). However, based on the findings in the trial court's February 19, 1999 order that Ms. Goff "is now doing all the right things," we assume that this conduct has abated. Accordingly, this behavior does not amount to a change of circumstances requiring a reopening of the custody issue. *See Solima v. Solima*, 7 S.W.3d at 33. In future custody proceedings, both parties' willingness and ability to facilitate and encourage a close and continuing parent-child relationship between the child and both parents will be factors that the trial court may consider.

Courts do not compare the fitness of the parties in a change of custody case until they have found that a material change in the child's circumstances has occurred. In light of our conclusion that the evidence preponderates against the trial court's finding that a material change in the child's circumstances had occurred after the entry of the March 24, 1997 divorce decree, we do not address the question of the comparative fitness of these parties at the time of the February 11, 1999 hearing.

## C.

The trial court was plainly dissatisfied with Ms. Goff's conduct in the context of the divorce and subsequent custody proceedings. The court found that Ms. Goof had been untruthful and had engaged in manipulative behavior. We do not discount these observations. Following the March 24, 1997 divorce decree, Ms. Goff's behavior has been less than exemplary. She deliberately misled Mr. Richard to believe that she and Courtney would be living with the Hummells, and gave Mr. Richard no telephone number with which he could contact Courtney directly. She arguably did nothing to discourage the threatening behavior of Messrs. Hummell and Goff toward Mr. Richard. Her testimony at the hearings of October 22, 1998 and February 11, 1999 was internally inconsistent and conflicted with the testimony of others, including that of her own witnesses. Finally, both she and Mr. Goff engaged in a transparent attempt to manipulate the trial court by getting married the evening before the October 22, 1998 hearing.

Nevertheless, we cannot fault Ms. Goff for the two occasions she refused Mr. Goff visitation during the child abuse investigation. Ms. Goff is not a lawyer and had some basis to believe that the DCS Safety Plan Agreement had the effect of suspending Mr. Goff's visitation rights. She was

following the explicit instructions of the DCS caseworker when she denied Mr. Richard visitation. Nor can we say, and the trial court did not find, that Ms. Goff's reports of child abuse were contrived. Both DCS and the child's pediatrician took both reports of abuse seriously. Moreover, the first report of abuse led to an eventual finding that deliberate squeezing caused the bruising on Courtney's feet. The court's inability to pinpoint the time the abuse occurred and its consequent inability to identify the perpetrator does not diminish the fact that Ms. Goff's report of abuse appear to have been well-founded.[15]

A party's misconduct during a divorce proceeding may provide evidence of his or her fitness to be the custodial parent. *See Adams v. Cooper*, No. M1999-02664-COA-R3-CV, 2000 WL 225573, at \*7 (Tenn. Ct. App. Feb. 29, 2000) (No Tenn. R. App. P. 11 application filed); *Gaskill v. Gaskill*, 936 S.W.2d at 633-34. However, the courts should be hesitant to use this sort of behavior as grounds for custody decisions when contempt and other remedies are available. *See Brumit v. Brumit*, 948 S.W.2d 739, 741 (Tenn. Ct. App. 1997). Whatever Ms. Goff's prior transgressions have been, the trial court has found that "she is now doing all the right things" and that "[h]ad she been conducting herself in this fashion all along, petition to change custody would never have been given a chance." In light of this finding, the trial court's concern about the genuineness of Ms. Goff's change in behavior and its apprehension that "she will revert to her prior practices as time passes" do not provide an adequate basis for changing custody. The trial court should deal with Ms. Goff's future transgressions if or when they occur.

## II.

We reverse the March 24, 1999 order changing custody from Ms. Goff to Mr. Richard and remand the case to the trial court with directions to enter an order returning custody to Ms. Goff under conditions either agreed to by the parties or prescribed by the court to protect the child. We tax the costs of this appeal in equal proportions to Leslie Ann Goff and her surety and to David Wayne Richard for which execution, if necessary, may issue.

---

[15]We emphasize that, like the juvenile court referee, we make no finding on who abused Courtney.