IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 28, 2001 Session

## SHERRY LEE LIGHTFOOT v. TOMMY EDWIN LIGHTFOOT

**Appeal from the Circuit Court for Hamilton County**
**No. 00-D-0907     L. Marie Williams, Judge**

**OCTOBER 4, 2001**

**No. E2001-106-COA-R3-CV**

In this divorce case, Tommy Edwin Lightfoot ("Husband") appeals the Trial Court's conclusion that he was voluntarily underemployed based on his accepting a lower paying position so he could live in close proximity to his girlfriend.  Husband also appeals the Trial Court's upward deviation from the child support guidelines and the award of alimony *in futuro* to Sherry Lee Lightfoot ("Wife"). We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Circuit Court Affirmed; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., and CHARLES D. SUSANO, JR., J., joined.

Lorraine Raymond, Chattanooga, Tennessee, for the Appellant Tommy Edwin Lightfoot.

Grace E. Daniell, Chattanooga, Tennessee, for the Appellee Sherry Lee Lightfoot.

# OPINION

## Background

Wife filed suit seeking a divorce from her husband of almost twenty-three years on the grounds of inappropriate marital conduct or, in the alternative, irreconcilable differences. Husband's Answer admitted there were irreconcilable differences, but denied he had engaged in any inappropriate marital conduct. Only the parties' youngest daughter was a minor. By the time of trial, the parties agreed how to equitably divide the vast majority of the marital estate. The main issues at trial centered around who was entitled to a divorce, the amount of child support, and whether Wife should be awarded alimony and attorney fees.

At the time of trial, Wife was 41 years old. The parties' youngest child turned 18 in October 2000 and was scheduled to graduate from high school in June 2001. Wife had a high school education and had been employed for various periods during the marriage. She mostly performed clerical work, although she taught gymnastics many years ago. Her income for the previous four years was: $28,610.48 in 1996; $33,373.04 in 1997; $13,777.39 in 1998; and $0.00 in 1999. For the first ten months of 2000 she earned $24,960.00. Both Wife and Husband worked while Husband completed his college education. Husband and Wife moved every year or two prior to Husband's completing his education. The parties moved to Chattanooga in 1994.

Approximately four years before trial, Husband began working as a consulting contractor ["contractor" or "consultant"] and no longer kept a permanent job. Husband's income significantly increased once he began working as a contractor. According to Wife, one reason Husband began working the higher paying contractor jobs was because Husband had taken out loans and charged a lot on credit cards. Wife claimed she had no knowledge of these loans or that they were behind on bills because Husband, at that time, was in charge of their finances. In 1994 and 1995, Husband's annual income averaged $50,398.86. Once he started working as a contractor, Husband's annual income increased as follows: $72,171.20 in 1996; $113,764.00 in 1997; $148,675.79 in 1998; and $173,137.88 in 1999. He earned $167,923.09 for the first seven months of 2000.

According to Wife, when she and Husband separated in March of 2000, Husband had been working at Solv Corporation in Boston for five or six months. Husband would locate contractor jobs on the internet. These jobs typically would last for about one year. When the parties separated, Wife had not worked in approximately two years. During that two year period, Wife took care of the home and children, and also assisted with caring for her ailing parents. Wife stated that they lived in an "upper middle class" home with four bedrooms. The parties assisted in the college education of their two eldest children. They were able to pay off most of their credit card and related debt in 2000.

Wife testified that on March 12, 2000, Husband apparently was having trouble making airline reservations and became angry. He told her he did not want to come home anymore

and was "tired of this." The next day, Husband traveled to Boston and talked with Wife on the phone. Wife asked if there was someone else and he responded "[W]hat if there was?". Wife told Husband she wanted to go to Boston. At that point, Husband told her that a woman had been living with him in the hotel in Boston and he needed to get some of her things cleared out before Wife arrived. Wife went to Boston and stayed there for approximately one month. During that time, the parties attended counseling.

Wife described Husband as her best friend and soul mate prior to the events starting on March 12. When asked if Husband ever identified the person with whom he was having an affair once it was revealed, Wife responded: "He said it had been going on for a year and that she was the love of his life and that he couldn't get over her and he didn't have the same feelings toward me anymore . . . ."

While in Boston, Wife was hospitalized for four or five days after taking too many Tylenol PMs in an attempt to "get his attention." Wife claims Husband later told her his girlfriend stayed with him in the hotel while Wife was in the hospital. Although Wife was covered through Husband's insurance at that time, Husband listed Wife as the sole responsible party when he signed her into the hospital. Wife testified that she still was receiving statements from the hospital in Boston. Just prior to Wife's leaving Boston, Husband told her he was disgusted with her, he did not want to come home, he was through, and Wife needed to move on because he had. After saying this, Husband turned around and walked out. Wife returned to Chattanooga.

After the parties separated, their youngest daughter visited Husband for one weekend. The only other time Husband visited with this daughter was when he stopped by her place of work in Chattanooga when he was in town for a court hearing.

Wife filed an affidavit of income and expenses. In this affidavit, Wife listed net monthly income of $1,595.56. Her monthly expenses for rent, utilities, car payment, insurance, and other expenses totaled $3,803.08. These expenses did not take into account any expenses directly associated with any of the three children, including the youngest child.

Husband testified that Wife brought more money into the marriage than he did and paid for the deposit on their first apartment, etc. Once Wife became pregnant with their first child, they moved in with her parents so Husband could concentrate on school and his full time job. Husband testified he decided in the 1996 time frame to go into consulting so he could make more money and better provide for his family. Husband accepted his first consulting job in 1996 in Nashville. He became a Year 2000 project manager for a while and after the turn of the century, became a project manager. Eventually, he was offered a position in Atlanta for $80.00 an hour and a job in Parsippany, New Jersey, for $100.00 an hour. While he wanted to be closer to home, Husband felt he needed the job which paid more and so accepted the consulting job in New Jersey. He traveled home every other weekend.

Husband was unemployed for two months after the job in New Jersey ended. When a potential job in Chattanooga fell through, Husband claims he took the first thing that came along because the parties' savings were being spent. This new job was a consulting position in Boston making $100.00 per hour. Husband testified being a consultant was stressful because of the various demands associated with that type of position.

Husband posted his resume on bulletin boards and on the internet after his job in Boston ended. He also attended technology fairs. He remained unemployed for seven weeks. He claimed he had problems locating a job because he had spent so much time being a Year 2000 Project Manager, a position no longer needed. He interviewed with two or three companies before securing employment at the company where he was employed at the time of trial. This job was in New Jersey with an annual salary of $70,000.00. This new position was a "permanent" job and not a consulting or contractor position. While the pay was much lower, so was the stress. Husband left his resume on the internet for one month after securing this job, and claims he received no inquiries about any available consulting position. Husband testified he wanted to stay in a permanent job as opposed to working in any more consulting positions. Although Husband claimed to have made a diligent search for employment, he admitted the permanent job he accepted was located in the same city in which his girlfriend lived. He testified this was a coincidence.

Husband did not agree with Wife's characterization of the marriage prior to the separation. According to Husband, the marriage had turned into more of a business relationship. He knew the marriage was essentially over for two or three years. Husband admitted to having an affair, but claimed his "friendship" with this other woman did not become intimate until about nine months prior to trial. Husband denied the affair caused the breakup of the marriage. Husband denied his girlfriend was with him at the hotel when Wife was in the hospital in Boston. He admitted obtaining a loan in 1994 for $1,500.00 and forging Wife's name on the loan documents. Husband testified his net income per month at his new permanent job was $3,868.00, and his monthly expenses were $2,938.00, not taking into account child support or potential alimony obligations. He denied supporting his girlfriend and claimed she was self-supporting. He later acknowledged, however, that his girlfriend has not worked for almost one year. Husband admitted he paid the rent and utilities for the house they were sharing, which totaled approximately $1,300.00 per month. Husband and his girlfriend live in a house owned by his girlfriend's mother. He has taken two trips to Maine with his girlfriend and bought her a wedding dress for $700.00. He bought her gifts such as jewelry, and she has accompanied him on several out of town trips. Husband acknowledged that other than dropping by his daughter's place of work for a few minutes when in Chattanooga for a court hearing, and the time she came to Boston for one weekend, he spent no time with his youngest daughter since the separation. Husband claims the reason he has not seen her more often is that he cannot afford to pay for her airfare.

Wife called Mr. James Levan ("Levan") as a witness. Levan is the vice-president of information systems and chief information officer for BlueCross BlueShield ("BlueCross") of Tennessee in Chattanooga. Levan is involved in the ultimate approval of all persons hired at BlueCross, including permanent employees and independent contractors. Levan testified that

BlueCross was currently utilizing 20 independent contractors, but he planned to double that number in the year 2001. Levan worked with Husband at BlueCross several years ago, and met Wife through working with Husband.

Based on his knowledge of working with Husband several years ago, Levan stated in his opinion that Husband was an experienced project manager. Levan testified that he keeps current on what the market is like as far as salaries provided to people who work on a contract basis. The compensation paid to someone with Husband's ability would vary depending on the area of the country in which that person was working. In Levan's opinion, a contractor in the Chattanooga area with Husband's skills should be able to earn between $50.00 to $60.00 per hour, which would equate to $100,000 to $120,000 per year not including overtime. A permanent employee with Husband's skills would earn between $65,000 to $70,000 per year. These figures would be significantly more in New Jersey. Levan believed Husband could earn between $130,000 to $156,000 as a consultant in the region in which Husband was living. According to Levan, there is a current demand for employees or contractors with Husband's skills. Levan agreed that certain negative aspects of a consulting job include moving around a lot, no benefits, and lack of long-term stability.

The Trial Court issued a detailed memorandum opinion which was incorporated into its final judgment. In that opinion, the Trial Court found, in part, that Wife had a high school education and worked off and on in clerical positions. Wife was responsible for the duties of both parents at home since Husband traveled so frequently. Husband was a college graduate. Wife had assisted Husband with his college course work. The Trial Court found that the demise of the marriage was caused by Husband's "blatant" affair, which he has continued "with no remorse or regret." The Trial Court further observed that Husband expended significant funds on his girlfriend, all the while claiming he did not have enough money to meet his alimony and child support obligations. The Trial Court found that Husband "has taken his mistress on vacations, traveled with her, bought her airline tickets, . . . paid her living expenses, and given her expensive jewelry." The Trial Court concluded that Husband was "totally responsible" for the demise of the marriage and further stated that Husband's testimony as to what caused the marriage to fail was not credible. The divorce was awarded to Wife.

The Trial Court also found Husband willfully underemployed. In reaching this conclusion, the Trial Court stated:

> Mr. Lightfoot contends he is tired of consulting jobs and has taken a job for $70,000.00 per year because he needs permanent employment. However, throughout his marriage, he was content to travel and not remain with the family. At a time when his wife could begin to travel with him as the youngest child is about to or has attained majority, he decided to settle down in Boston, stop traveling, cut his income, enter into an affair, and leave his family. He has taken a job in a physical location convenient to his mistress and states he does not want to go back into consulting. As Mr. Lightfoot

phrased it, "the money is not worth it." Even Mr. Lightfoot could not keep a straight face during this testimony and laughed during his testimony concerning the salary difference between the consulting and steady employment.

Based on the testimony of the parties as well as Levan, the Trial Court concluded that Husband had an earning capacity of $145,000.00. This figure was arrived at by averaging Husband's earnings for 1996 through projected 2000 at consulting positions. The Trial Court also specifically took note of Levan's testimony as to what Husband could earn as a consultant in the region where he currently lived. The Trial Court then concluded that Husband "has voluntarily chosen to be underemployed for the purposes of remaining with his mistress and depriving his wife of the benefits of the earning capacity she helped him acquire." Having found Husband voluntarily underemployed and after determining his earning capacity, the Trial Court set child support in accordance with the child support guidelines based on Husband's earning capacity, i.e., $145,000.00. The Trial Court then deviated upwards from the guidelines in the amount of $500.00 per month. The primary reason for this upward deviation was that Husband was spending little or no time with his youngest daughter.

Finally, the Trial Court awarded Wife alimony *in futuro* of $1,700.00 per month. The Trial Court based this decision on the factors contained in Tenn. Code. Ann. § 36-5-101, in particular "the relative earning capacity, obligations, needs, financial resources of each of the parties, the relative education and training of the parties, the duration of the marriage, the standard of living of the parties established during the marriage, the clear fault of [Husband] in causing the divorce, and the tangible and intangible contributions to the marriage made by both parties …." In reaching its conclusion that alimony *in futuro* was appropriate, the Trial Court made a specific finding that Wife could not be rehabilitated to a point where her earnings could be commensurate with Husband's or in which she could maintain "a semblance of [the] lifestyle established during the marriage." The Trial Court also observed that Husband had the ability to pay and Wife was "clearly" in need.

## Discussion

Husband challenges the Trial Court's conclusion that he was voluntarily underemployed and the resulting setting of child support and alimony based on his potential earnings, rather than actual earnings. Husband also challenges the Trial Court's award of alimony *in futuro* rather than rehabilitative alimony. Husband also contends the Trial Court erred when it deviated upward from the Child Support Guidelines.

Our standard of review with regard to matters decided by the Trial Court is well settled. A review of findings of fact by a trial court is *de novo* upon the record of the trial court, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Brooks v. Brooks*, 992 S.W.2d 403, 404 (Tenn. 1999). Review of questions of law is *de novo*, without a presumption of correctness. *See Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

We first address the Trial Court's determination that Husband was voluntarily underemployed. Whether a party is willfully and voluntarily underemployed is a factual issue and the trial court is given "considerable discretion" in its determination. *Willis v. Willis*, No. W2000-01613-COA-R3-CV, 2001 WL 687067 at *2 (Tenn. Ct. App. June 18, 2001)(perm. app. filed). In making this determination, the trial court should consider past and present employment, and whether the choice to accept a lower paying job was reasonable and made in good faith. *Willis*, 2001 WL 687067 at *2. Willful and voluntary underemployment can impact the amount of child support and alimony to be paid. The statute governing alimony specifically refers to "earning capacity," as opposed to actual earnings. Tenn. Code Ann. § 36-5-101(d)(1)(A). Likewise, the child support guidelines provide if an obligor is willfully and voluntarily underemployed, "child support shall be calculated based on a determination of potential income, as evidenced by education level and/or previous work experience." Tenn. Comp. R. & Regs. ch. 1240-2-4-.03(3)(d). *See also Erwin v. Erwin*, No. W1998-00801-COA-R3-CV, 2000 WL 987339 at *3 (Tenn. Ct. App. June 26, 2000)(no perm. app. filed)(affirming the trial court's conclusion that the husband was voluntarily underemployed for purposed of determining child support and alimony).

From the record before us, we do not believe the Trial Court erred when it found that Husband was voluntarily underemployed, and that he accepted a much lower paying job so he could be with his girlfriend. The Trial Court had obvious problems with Husband's credibility on this issue, going so far as to point out in its memorandum opinion that Husband could not even "keep a straight face" and "laughed" during this part of his testimony. The Trial Court's factual determination involving witness credibility will be given great weight on appeal. *See Barnhill v. Barnhill*, 826 S.W.2d 443, 448 (Tenn. Ct. App. 1991)(citing *Town of Alamo v. Forcum-James Co.*, 205 Tenn. 478, 327 S.W.2d 47 (1959)). *See also Rice v. Rice*, 983 S.W.2d 680, 682 (Tenn. Ct. App. 1998)("[O]n an issue which hinges on witness credibility, [the trial court] will not be reversed unless, other than the oral testimony of the witnesses, there is found in the record clear, concrete and convincing evidence to the contrary.").

Once the Trial Court concluded Husband was voluntarily underemployed, it had to determine what income should be imputed to him for purposes of determining child support and alimony, if awarded. The child support guidelines specifically address educational level and/or previous work experience as factors to be considered in making this determination. Tenn. Comp. R. & Regs. ch. 1240-2-4-.03(3)(d). An obligor's potential income is a question of fact. *Willis*, 2001 WL 687067 at *3. The Trial Court considered all relevant factors, including Husband's work experience and education as well as the expert witness's testimony. The evidence does not preponderate against this finding by the Trial Court. We conclude that the Trial Court did not err in its determination of Husband's potential income or earning capacity for purposes of setting both child support and alimony.

The child support guidelines contemplate a certain amount of visitation by the non-custodial parent. If this visitation is not being exercised, the custodial parent may be entitled to additional child support. Specifically, Tenn. Comp. R. & Regs. ch. 1240-2-4-.04(1)(b) provides:

If the child(ren) is/are not staying overnight with the obligor for the average visitation period of every other weekend from Friday evening to Sunday evening, two weeks during the summer and two weeks during the holiday periods throughout the year, then an amount *shall* be added to the percentage calculated in the above rule to compensate the obligee for the cost of providing care for the child(ren) for the amount of time during the average visitation period that the child(ren) is/are not with the obligor . . . . (emphasis added).

From when the parties separated until trial, Husband had contact with his youngest daughter on two occasions. The first occasion was when she visited him for one weekend. The second was when Husband stopped by her place of employment for a few minutes while he was in town for a court hearing.[1] Based on this undisputed testimony, it certainly appears unlikely that Husband would exercise any overnight visitation during the remaining few months he is obligated to pay child support. Husband argues that the Trial Court could not properly make this determination until he had an opportunity to try and establish a post-divorce pattern of visitation. The Trial Court made this factual determination based on the facts presented to it at trial, and we cannot say that the Trial Court erred in making this determination. If Husband does exercise sufficient visitation such that an upward deviation from the guidelines is not appropriate, he can seek from the Trial Court a modification of his child support obligation. We conclude that the Trial Court did not commit reversible error when it deviated upward from the guidelines.

Next, we consider the Trial Court's award of alimony *in futuro* to Wife of $ 1,700.00 per month. Trial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount, and duration. *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998); *Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996). "Appellate courts are generally disinclined to second-guess a trial judge's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes." *Kinard*, 986 S.W.2d at 234.

Determinations concerning the amount and duration of alimony are factually driven and require a balancing of the various factors contained in Tenn. Code Ann. § 36-5-101(d)(1). *Herrera v. Herrera*, 944 S.W.2d 379, 387-88 (Tenn. Ct. App. 1996). These factors include:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

---

[1] Husband testified at trial that his youngest daughter discussed with him the possibility of staying with him the next summer. By the time this occurs (assuming it does at all), she will not be a minor and will have graduated from high school and, therefore, there will be no child support owing at all. Accordingly, this does not affect our resolution of this issue.

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36-4-121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

The statute also provides that it is the intent of the general assembly that an economically disadvantaged spouse be rehabilitated, whenever possible, with the payment of temporary support and maintenance. When this is not feasible after considering all relevant factors, then the court may award support and maintenance on a long term basis, or alimony *in futuro*.

After a careful review of the entire record, we do not believe the Trial Court erred when it concluded that this was a proper case for an award of alimony *in futuro*. Wife is certainly in need of alimony, and Husband has the ability to pay the alimony awarded. The Trial Court awarded alimony in an amount that will require Wife to make some further adjustments to her lifestyle, but will nevertheless enable her to meet her monthly expenses. Given Wife's educational background and work history, the Trial Court concluded that she could not be sufficiently rehabilitated. The Trial Court carefully considered the relevant factors set forth in Tenn. Code Ann. § 36-5-101. As neither does the evidence preponderate against the Trial Court's spousal support decision nor is that decision contrary to public policies reflected in the statutes, we will not second guess the Trial Court's alimony determination. We affirm the ruling of the Trial Court on this issue.

### Conclusion

The judgment of the Trial Court is affirmed. This case is remanded to the Trial Court for further proceedings as may be required, if any, consistent with this Opinion, and for collection of costs below. Costs of appeal are taxed to the Appellant, Tommy Edwin Lightfoot, and his surety.

_____
D. MICHAEL SWINEY