COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

FILED

March 26, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| KATHERINE RENEE RICE, | ) | C/A NO. 03A01-9708-CV-00415 |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | |
| v. | ) | APPEAL AS OF RIGHT FROM THE |
| | ) | McMINN COUNTY CIRCUIT COURT |
| | ) | |
| | ) | |
| | ) | |
| JAMES TIMOTHY RICE, | ) | |
| | ) | HONORABLE JOHN B. HAGLER, JR., |
| Defendant-Appellee. | ) | JUDGE |

For Appellant

LYNN TARPY
THOMAS M. LEVEILLE
Hagood, Tarpy & Cox, P.L.L.C.
Knoxville, Tennessee

For Appellee

S. RANDOLPH AYRES
Athens, Tennessee

O P I N I O N

AFFIRMED AND REMANDED                                   Susano, J.

In this divorce case, the trial court awarded the original defendant, James Timothy Rice ("Husband"), an absolute divorce from Katherine Renee Rice ("Wife"); granted Husband custody of the parties' child, Madalyn Sue Rice (DOB: April 20, 1993); divided the parties' personal property and debts; and pronounced other decrees that are not relevant to the issues on this appeal. Wife appealed, presenting issues that raise the following questions:

> 1. Does the evidence preponderate against the trial court's judgment awarding Husband a divorce?
>
> 2. Does the evidence preponderate against the trial court's decision to award custody of the parties' child to Husband?
>
> 3. Did the trial court err in refusing to allow testimony regarding Husband's practice of reading "pornographic" magazines?
>
> 4. Does the evidence preponderate against the trial court's decree ordering Wife to pay a deficiency indebtedness on the parties' Jeep?

We affirm.

I. *Factual Background*

The parties were married in Pennsylvania on September 21, 1993. They had been involved prior to their marriage, and their earlier relationship had produced a child, Madalyn Sue Rice, who was born on April 20, 1993. Wife has another child, Meghan LeBlanc, who was five at the time of the trial below.

2

For the bulk of the parties' three-year plus marriage, Husband was employed as a salesman for various owners of cemetery properties. During the marriage, Husband worked in, and the parties resided in, the states of Pennsylvania, Missouri, Indiana, Illinois, and finally Tennessee. Husband moved to Athens, Tennessee in May, 1995. Wife and the two children followed him to Tennessee at the end of July, 1995.

Prior to moving Tennessee, Husband had learned that Green Hill Cemetery in Etowah was available for sale. He talked to a Jim Randolph, his best friend who he had known for 10 years, about the cemetery and, according to Husband, Randolph agreed to purchase the cemetery and agreed that he and Husband would ultimately be partners in the business. Husband and Randolph then both re-located to McMinn County to pursue this business interest.

Husband was initially successful in selling lots at the Etowah cemetery; however, shortly after moving to Tennessee, Randolph began personally pursuing leads that were received at the cemetery office, and Husband decided that Randolph was not dealing with him in a fair manner.[1] Concluding that there was not enough business to support the two of them, Husband decided to look elsewhere for employment.

Approximately four to six weeks after Wife moved to Athens, Husband decided to leave Tennessee for a job at a cemetery in Georgia. Wife refused to relocate to Georgia,

---

[1]According to Husband, Randolph failed to advertise the business as he had agreed to do.

3

reminding Husband that she had told him that the move to Tennessee was her last.  Husband suggested counseling, but Wife declined to participate.

In October, 1995, while Husband was working in Georgia, Wife returned to Illinois with the children and moved in with her brother and his family.

Wife returned to Tennessee in January, 1996, and moved in with Randolph at his home in Englewood.  The children moved with her.  According to Wife, she and Randolph started a sexual relationship in March, 1996.  At the time of trial, Wife and Randolph were still living together with the children in Englewood.  Husband was living with his parents in Crystal Lake, Illinois, where he was employed selling home security systems.

## II.  *Procedural History*

Wife filed for divorce on April 8, 1996, some three months after moving in with Randolph.  She alleged that she was entitled to a divorce on the ground of inappropriate marital conduct.

4

Husband moved for a bill of particulars, relying on T.C.A. § 36-4-106(a)[2] and Rule 12.05, Tenn.R.Civ.P.[3] Wife responded by alleging verbal and physical abuse, and use of profanity in front of the children. In addition, she relied upon the grounds of abandonment and non-support under T.C.A. § 36-4-102 (a)(3).

On December 18, 1996, Husband filed an answer and counterclaim for divorce. Both parties sought custody of their minor daughter.

Following two days of trial, the court took the matters before it under advisement. On January 23, 1997, the court entered its final judgment, which recites the following predicate for the relief granted:

> ...the Court finds and holds that...Katherine Renee Rice, has been living in an adulterous relationship for approximately one year with a man by the name of Jim Randolph, that [she] has allowed said Jim Randolph to assume an inappropriate role in interfering with the father's relationship with the parties' minor daughter, and that under the provisions of Tennessee Code Annotated § 36-4-102(a)(1)...[she] has been guilty of inappropriate marital conduct. The Court further finds that [her] testimony concerning

---

[2]T.C.A. § 36-4-106(a) provides, in pertinent part, as follows:

> In cases wherein an answer is filed, the court shall, on motion of the defendant, require the complainant to file a bill of particulars, setting forth the facts relied on as grounds for the divorce, with reasonable certainty as to time and place.

[3]Rule 12.05, Tenn.R.Civ.P., provides, in pertinent part, as follows:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading.

> alleged abuse by [Husband] was not
> particularly persuasive and that the real
> reason for the breakup of the marriage is
> [her] relationship with one Jim Randolph,
> rather than any abuse as alleged by [her].

### III. *Standard of Review*

In this non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a presumption of correctness that we must honor "unless the preponderance of the evidence is otherwise." Rule 13(d), T.R.A.P. *See also* **Hass v. Knighton**, 676 S.W.2d 554, 555 (Tenn. 1984). Our search for the preponderance of the evidence is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such credibility determinations are entitled to great weight on appeal. **Massengale v. Massengale**, 915 S.W.2d 818, 819 (Tenn.App. 1995); **Bowman v. Bowman**, 836 S.W.2d 563, 567 (Tenn.App. 1991). In fact, this court has noted that

> ...on an issue which hinges on witness
> credibility, [the trial court] will not be
> reversed unless, other than the oral
> testimony of the witnesses, there is found in
> the record clear, concrete and convincing
> evidence to the contrary.

**Tennessee Valley Kaolin Corp. v. Perry**, 526 S.W.2d 488, 490 (Tenn.App. 1974).

### IV. *Analysis*

Wife contends that she, not Husband, should have been granted the divorce. She argues that Husband's conduct before their separation was the real cause of the breakup of their marriage.

"[A] divorce suit is not designed to determine which spouse has been perfect in behavior, for perfection is found no more in marriage than elsewhere." *Bush v. Bush*, 684 S.W.2d 89, 92 (Tenn.App. 1984). When a marriage is examined in a court proceeding, it generally reveals a union with "imperfections in both spouses." *Id*. Courts attempt to determine the "straw that broke the camel's back" -- conduct that finally brought an "end" to the marriage relationship. *Id*. As a practical matter, that can be a single incident or an accumulation of matters over time.

In this case, the trial court determined that the real cause of the breakup of this marriage was Wife's adulterous relationship with Randolph. In denying Wife's motion to alter or amend, or for a new trial, the court made the following significant statements:

> Also, I think I should add that I did judge the credibility of the witnesses. I could not -- well, I'll put it this way: Had I believed all the allegations of abuse, it might have been a different case, but I watched the witnesses testify and I could not accredit much of that testimony.
>
> I also felt very clearly that the mother's relationship with Mr. Randolph began earlier than she had testified. I think that's one reason Mr. Randolph was not here to testify in court, because there was going to be a lot of questions asked and to be answered with respect to that. I think there was a great deal of deception involved in the early part

7

> of that relationship, and all that went into
> account in the Court's decision in judging
> the credibility of the parties as they
> appeared before the Court.

"[A] persistent pattern of adulterous conduct" will support a grant of an absolute divorce on the ground of inappropriate marital conduct. *Farrar v. Farrar*, 553 S.W.2d 741, 744 (Tenn. 1977). It is likewise clear that post-separation conduct of an inappropriate nature will support a grant of divorce under certain circumstances. *Clark v. Clark*, 644 S.W.2d 681, 682 (Tenn.App. 1982); *Perry v. Perry*, 765 S.W.2d 776, 779 (Tenn.App. 1988).

In this case, the parties had sharply contrasting theories as to the cause of the end of their marriage. Wife claimed that Husband's verbal and physical abuse, coupled with the instability of his employment and his failure to support his family, were the main causes of the failure of their marriage. On the other hand, Husband pointed to Wife's relationship with Randolph as the ultimate cause of their breakup. The trial court resolved these credibility issues in favor of Husband. The court did not find the evidence of abuse to be persuasive. As we have previously indicated, a trial judge, who sees and hears the witnesses, is in a much better position than are we to resolve competing and sharply contrasting testimony. *Tennessee Valley Kaolin Corp.*, 526 S.W.2d at 490.

There is evidence in the record to support the trial court's conclusion that Wife and Randolph were involved before

8

March, 1996, the point in time at which Wife claimed the affair began. Wife admitted that she and the children had dinner out with Randolph in October, 1995, and also admitted that he visited her in Illinois for Thanksgiving, 1995. There was also evidence of gifts and long-distance phone calls prior to March, 1996. This evidence gives rise to a reasonable inference, accepted by the trial court, that there was a romantic, if not sexual, relationship prior to March, 1996.

In view of the trial court's very explicit findings regarding the credibility of the parties, we cannot say that the evidence preponderates against the grant of divorce to Husband. Wife's issue as to the divorce is found adverse to her.

Wife also complains about the trial court's award of custody of the parties' minor daughter to Husband. She argues that the trial court awarded custody to Husband in order to punish Wife for her adulterous relationship with Randolph. She relies upon a number of cases holding that custody should not be used to punish a party for errant behavior. *See, e.g.,* **Sutherland v. Sutherland**, 831 S.W.2d 283, 286 (Tenn.App. 1991). She points out that she was the primary caregiver, that even Husband acknowledges that she is a good mother, that the court's decree has the effect of separating Madalyn from her half-sister, and that Husband's employment instability and failure to send support demonstrates his unfitness as a custodian. Wife claims that the court failed to make the analysis required by both T.C.A. § 36-6-106 and the "comparative fitness" test first named in **Bah v. Bah**, 668 S.W.2d 663, 666 (Tenn.App. 1983).

9

The trial court made explicit findings on the subject of custody:

> ...the Court never intends to use custody to punish a party. If the Court does that, then the Court is wrong. I don't think that I used custody to punish the mother in this case.
>
> The Court had to decide which parent would be more likely to insure that this four-year-old child would have a relationship with both parents. And after hearing all the evidence, I found that if the father had custody, there was a greater chance that the child would have a meaningful relationship with the mother than if the mother had custody, because the mother's paramour had seriously interfered with the father's access to the child.
>
> There was only one part of the case that shocked me. That was the part that shocked me, that the mother's new friend simply attempted to take the place of the father in this case. I think the evidence was overwhelming. And even after taking the tender years' doctrine, the continuity and placement, and so forth, into account, the Court felt that it was in the best interest of the child that the father have custody, and nothing has been changed -- has been shown that would make me change my opinion. If the Court is wrong in that regard, I hope the appellate court will correct it.
>
>            *     *     *
>
> Whether I gave proper weight to the different factors is a question for someone else, but I can assure you that I considered all the factors which the legislature requires the Court to consider.

We do not find support in the record for Wife's argument that the trial court did not employ the analysis required by T.C.A. § 36-6-106 and the *Bah* case. On the contrary, the record clearly reflects that the trial court correctly analyzed the issue of custody. There was substantial evidence

10

that Wife permitted Randolph -- described by both parties as "dictatorial" -- to interfere with, if not control, Husband's relationship with his daughter. Randolph's conduct in this case gives rise to a reasonable inference, drawn by the trial court, that Wife's continued exercise of custodial rights in the Randolph household would severely limit, and adversely affect, Husband's relationship with the child.

There is also proof in the record that Madalyn is confused by her mother's relationship with Randolph. Wife admitted that she and Randolph kissed, hugged, and held hands in front of the children. Madalyn's confusion is shown clearly by the fact that she would sometimes call Randolph "Daddy," while she frequently called her real father by his first name. Randolph's involvement in Madalyn's life is further shown by the fact that he administered discipline to the child by spanking her with a hair brush. There was also testimony that as early as December, 1995, Madalyn had told her paternal grandmother that Randolph was going to be her new daddy.

The best interest of a child is the overriding consideration in all custody determinations. T.C.A. § 36-6-106; *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983). Generally speaking, it is not appropriate to separate siblings by a custody order. *Baggett v. Baggett*, 512 S.W.2d 292, 293-94 (Tenn.App. 1973); but this principle is not inflexible. It must give way to other considerations if the best interest of a child so dictates.

11

We do not believe that the trial court awarded custody to Husband in order to punish Wife for her adulterous conduct. Wife's adultery is not the issue. What is important about that relationship is Wife's decision to move into Randolph's house, knowing that Randolph and her husband had had a falling out,[4] and then allowing Randolph to act as her surrogate with respect to Husband's relationship with his daughter. It is a reasonable inference from the proof -- including testimony regarding a physical altercation between Randolph and Husband -- that Randolph permitted his personal animosity to affect his anointed role as Wife's surrogate for visitation matters.

It is unfortunate that Madalyn will be separated from her half-sister. The trial court attempted to lessen the effect of this separation by "encourag[ing]" Wife to allow Meghan to visit in Husband's home. As we have previously indicated, the best interest rule trumps all other custody principles -- including the one generally disfavoring separation of siblings.

In resolving credibility issues as to entitlement to divorce and custody, it is clear that the trial court was influenced somewhat by Randolph's failure to testify. In this case, the trial court was within its discretion in drawing an inference adverse to Wife under the so-called missing witness rule. *See* NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE § 401.9 (3d ed. 1995)("The general rule is that failure to call a witness who (1) has peculiar knowledge of facts, and (2) would naturally

---

[4]Husband testified that Randolph, who had been his best friend, failed to honor his commitment to Husband regarding the Etowah cemetery; Randolph, on the other hand, believed that Husband had stolen money from the cemetery.

12

favor the party's contention raises an inference that the testimony would have been unfavorable to the party who failed to call the witness.").

The evidence reflects that Husband has established good living conditions for his daughter in Illinois. There was no evidence indicating that Madalyn will be adversely affected by living with Husband in the home of his mother and stepfather.

The evidence does not preponderate against the trial court's award of custody to Husband.

Wife contends that the trial court erred in failing to allow her counsel to inquire into Husband's practice of reading "pornographic" literature. We do not find this to be error in this case.

The totality of the record pertaining to this subject is as follows:

> Q    What other problems were there in your marriage?
>
> A    He drinks a lot.  And I'm not a doctor, but he's very close to being an alcoholic. He cusses.  He throws a temper.  He likes to read dirty magazines; he has them laying around the house; I mean just tons of stuff. It was -- just there was a pile and pile of stuff there.
>
> MR. AYRES: Your Honor, I'm going to object to this.  We asked for a bill of particulars. We also asked in her deposition and this never came out in it either.  They filed their specifics and there was nothing in there about any so-called "pornography," and that's the first I've ever heard of this.

13

THE COURT: Mr. McKenzie, do you --

MR. McKENZIE: As far as -- go back to the alcohol, Your Honor, I think we did mention he was verbally abusive.  Certainly the alcohol, if I could question her --

THE COURT: What about the books?

MR. McKENZIE: The magazines we did not list that as a specific ground.

THE COURT: What about, was the deposition taken?

MR. McKENZIE: Yes.  I don't remember that being mentioned.

THE COURT: Did Mr. Ayres ask any questions that that would have been a fair answer to?

MR. McKENZIE: Your Honor, I believe he asked her what were the, what were the problems in the marriage and --

THE COURT: I think I'll sustain the objection.

The testimony sought to be elicited in this case was not relevant.  This is because Wife did not allege Husband's reading of pornographic literature as a part of her grounds for divorce.  The question before the trial court pertained solely to Wife's grounds for divorce.  Husband had attempted to "flesh" these grounds out by filing his motion for bill of particulars.  Since this matter was not raised in the pleadings, questions about it were irrelevant.  *George v. Alexander*, 931 S.W.2d 517, 525 (Tenn. 1996) (Reid, J., concurring); *Bridges v. CSX Transp., Inc.*, 845 S.W.2d 760, 764 (Tenn.App. 1992).  The function of a pleading is to "give notice to the parties and the trial court of the issues to be tried." *Castelli v. Lien*, 910 S.W.2d 420, 429 (Tenn.App. 1995).

14

Wife cannot contend that Husband was not surprised by this line of inquiry.  The record before us clearly reflects that Husband's counsel was in fact surprised by the testimony.  Wife's deposition is in the record, and it is entirely devoid of any reference to the pornographic literature issue.  Husband's counsel questioned Wife regarding her grounds for divorce in the deposition and she failed to mention, in any way, Husband's use of pornographic material.  This issue is found adverse to Wife.

Finally, Wife contends that the trial court erred in requiring her to pay a deficiency debt of $3,200 on the parties' Jeep.

Generally speaking, marital debts are to be equitably divided between the parties.  *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 243 (Tenn.App. 1995); *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn.App. 1989).  "When practicable, the debts should follow the assets they purchased."  *Id.*

The Jeep was titled in Wife's name.  Husband left this vehicle with Wife after she had moved in with Randolph.  It was in Wife's possession when it was repossessed.

There were a number of debts allocated between the parties in the judgment of divorce.  We find that the evidence does not preponderate against the trial court's decision that it was equitable to burden Wife with the deficiency on the Jeep debt.

15

The judgment of the trial court is affirmed.  Costs on appeal are taxed against the appellant and her surety.  This case is remanded to the trial court for enforcement of that court's judgment and collection of costs assessed there, all pursuant to applicable law.


_____
Charles D. Susano, Jr., J.

CONCUR:


_____
Herschel P. Franks, J.


_____
Don T. McMurray, J.