IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
JULY 22, 2004 Session

## MONICA WHITE MUELLER v. DAVID EDMOND MUELLER

**Direct Appeal from the Chancery Court for Lauderdale County**
**No. 12, 421     Martha Brasfield, Chancellor**

_____

**No. W2004-00482-COA-R3-CV - Filed November 17, 2004**

_____

This appeal concerns the trial court's findings regarding child custody and rehabilitative alimony in a divorce action. Following a bench trial, the chancery court ruled that the mother would be the minor child's primary residential parent. The father was awarded standard visitation pursuant to the Permanent Parenting Plan. The chancellor also awarded the mother rehabilitative alimony for a period of three years. The father has appealed the rulings of the chancery court to this Court. For the following reasons, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S, and DAVID R. FARMER, J., joined.

J. Thomas Caldwell, Ripley, TN, for Appellant

Rebecca S. Mills, Ripley, TN, for Appellee

**OPINION**

**Factual Background and Procedural History**

David Edmond Mueller ("Husband" or "Appellant") and Monica White Mueller ("Wife" or "Appellee") married on May 31, 1988. The parties have one child together, Laura Ashley Mueller ("Daughter"), born on February 22, 1992. During the marriage the parties resided in Ripley, Tennessee. Husband was forty-nine years of age at the time of the trial, and he is employed as a supervisor with the Tennessee Department of Correction. Wife was forty-three years of age when this case was heard below, and she previously worked in the human resources department at a local factory for twelve years. Wife was no longer employed at the factory when this case came to be heard below, and she remained unemployed at the time of this appeal.

When Daughter started kindergarten, her teachers began to notice a problem with Daughter's academic development. Husband and Wife took Daughter to the University of Tennessee Boling Center for Developmental Disabilities (the "Boling Center") in October of 1998 for an evaluation. The testing conducted by the Boling Center revealed that Daughter suffered from mild to moderate mental retardation which also affected her speech. Following Daughter's diagnoses, she was placed in special education classes at school.

Due to the parents' work schedules, Francis Mueller ("Grandmother"), grandmother to Daughter and mother of Husband, took an active role in Daughter's life at an early age. Grandmother lived a few blocks away from the parties' home, and would come by each morning to take Daughter to school. The parties signed a release form allowing Grandmother to communicate with personnel at the Boling Center concerning Daughter's progress. When Daughter started the third grade, Grandmother began tutoring Daughter in the afternoons after school and in the summer. In 2000, Grandmother contacted the Boling Center to discuss Daughter's placement in special education classes. The Boling Center re-tested Daughter and discovered an increase in Daughter's IQ level. As a result, personnel at the Boling Center recommended that Grandmother continue her one-on-one tutoring with Daughter.

The parties' relationship began to deteriorate in the early part of 2002. Wife alleged that, between 2001 and the early part of 2002, she learned of Husband's extramarital affairs with several different women. In May of 2002, Husband's employer charged him with conduct unbecoming a state employee and launched an internal investigation. As a result of this investigation, Husband was suspended from work and transferred to a new correctional facility in Memphis, Tennessee. Wife began placing numerous telephone calls from work to various individuals to discuss her marital problems. Two of the women Wife accused of having an affair with Husband filed criminal charges against Wife. Wife accused Husband of verbally and physically abusing her, often cursing her in front of Daughter. Wife also alleged that Husband had a gambling problem. Facing termination, Wife was ultimately forced to resign from her job in the later part of 2002 for excessive absenteeism.

In July of 2002, Wife moved out of the marital home. Wife also discontinued Daughter's tutoring sessions with Grandmother. Daughter had a $500 savings bond which Wife cashed by forging Husband's name because, according to Wife, she needed the money to pay bills. On July 12, 2002, Wife filed a complaint for divorce in the Chancery Court of Lauderdale County. In her complaint, Wife requested that the chancery court designate her Daughter's primary residential parent, and she asked the court for both temporary and permanent alimony. Husband filed an Answer and Counter-Complaint asking for a divorce from Wife. Husband also submitted a proposed Temporary Parenting Plan which designated him the primary residential parent during the pendency of the proceedings, and alleged that Wife's mental instability posed a danger to Daughter. During the course of the proceedings below, Wife began seeing a series of therapists for depression. One of the therapist diagnosed Wife as having obsessive-compulsive disorder and prescribed medication to treat Wife. Wife contended that she went to see these therapist at the prodding of Husband and Grandmother.

While this case was pending before the chancery court, Daughter's performance in school began to suffer. On August 2, 2002, Husband filed a petition asking the chancellor to allow Grandmother to continue to tutor Daughter. The chancellor entered an order granting Husband's petition on August 22, 2002. On August 27, 2002, the chancellor entered a consent order designating Wife the temporary primary residential parent, ordering Husband to pay $600.00 per month in child support, granting Husband weekend visitation, ordering Husband to continue to pay Wife's car note, and ordering Husband to pay Wife temporary alimony in the amount of $250.00 per month. On August 12, 2003, the chancellor entered an order requiring Husband to pay Wife an additional $75.00 in temporary alimony on top of the previous order of $250.00.

The chancellor also appointed a guardian ad litem to represent Daughter's interests in this case. The guardian ad litem submitted a written report to the chancery court stating that, while Grandmother was "a force to be reckoned with," she "was the chief child care provider and tutor for [Daughter]" when both parties were working. The guardian ad litem reported that Daughter and Grandmother had formed a strong emotional bond between them, and that Grandmother had more influence over Daughter than either parent. The report further indicated that both Husband and Wife were fit parents, yet due to the fact that Husband had to drive to work in Memphis each day and worked the afternoon shift, Mother should be designated the primary residential parent since she was unemployed.

This case came to be heard by the chancery court over a period of several days spanning from July 8, 2003, to September 30, 2003. The chancellor issued a Final Decree of Divorce and Permanent Parenting Plan on November 18, 2003. The chancellor designated Wife the primary caretaker of Daughter and awarded Husband standard visitation. The chancery court also awarded Wife her retirement, which she previously cashed out, and ordered Husband to pay the IRS penalty in the amount of $2,103.35. Each party was ordered to pay their own credit card debts, and the court ordered Wife to replace Daughter's savings bond in the amount of $500.00. Husband received the marital home and one vehicle, and he was also ordered to make the loan payments on Wife's car. Finally, the chancellor ordered Husband to pay Wife rehabilitative alimony for a period of three years following the divorce. Husband filed a timely appeal to this Court, asking us to entertain the following issues:

I.      Whether the trial court erred in designating Appellee the primary residential parent of the parties' minor child; and
II.     Whether the trial court erred in awarding Appellee rehabilitative alimony.

In addition, Wife asks this Court to award her attorney's fees and expenses incurred in defending this appeal.

## Standard of Review

"[R]eview of findings of fact by the trial court in civil actions shall be *de novo* upon the

record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d) (2003). This same standard of review applies to a trial court's findings of fact in child custody cases. *Whitaker v. Whitaker*, 957 S.W.2d 834, 838 (Tenn. Ct. App. 1997); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984).

A determination of the best residential placement for a child must turn on the particular facts of each case. *Niceley v. Niceley*, No. M2001-02182-COA-R3-CV, 2003 Tenn. App. LEXIS 214, at *12 (Tenn. Ct. App. Mar. 14, 2003). When we review a determination of child custody by a trial court, we are mindful of the following:

> Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law. *D v. K*, 917 S.W.2d 682, slip op. at 8–9 (Tenn. Ct. App. 1995), *perm app. denied* (Tenn. Feb. 5, 1996).

*Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996); *see also Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). "Our search for the preponderance of the evidence is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such credibility determinations are entitled to great weight on appeal." *Rice v. Rice*, 983 S.W.2d 680, 682 (Tenn. Ct. App. 1998) (citations omitted); *see also Adelsperger*, 970 S.W.2d at 485. "[W]e decline to disturb custody decisions unless they are based on a material error of law or the evidence preponderates against them." *Adelsperger*, 970 S.W.2d at 485 (citations omitted).

We also review a trial court's findings of fact regarding an award of alimony *de novo* upon the record accompanied by a presumption of correctness. Tenn. R. App. P. 13(d) (2003); *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000). "The amount of alimony awarded is largely a matter left to the discretion of the trial court, and the appellate courts will not interfere except in the case of an abuse of discretion." *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001). "A trial court abuses its discretion only when it 'applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining.'" *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003) (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999))). "Accordingly, appellate courts give wide latitude to a trial court's alimony and maintenance decisions." *Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989).

**Designating a Primary Residential Parent**

On appeal, Husband argues that the evidence in this case clearly demonstrates that he should have been designated Daughter's primary residential parent. Husband asserts that stability is key for children in Daughter's position and argues that he is in a better position to ensure that Daughter will improve academically. In support of this argument, Husband points to the family support structure he is able to offer Daughter: primarily, unlimited access to Grandmother who has been a key figure in Daughter's academic development. Husband, therefore, asks us to reverse the ruling of the chancellor and find that Husband should be the primary residential parent based on the evidence presented at trial below.

"Any final decree or decree of modification in an action for absolute divorce, legal separation, annulment, or separate maintenance involving a minor child shall incorporate a permanent parenting plan. . . ." Tenn. Code Ann. § 36-6-404(a) (2003). The parenting plan must set forth a residential schedule which designates the primary residential parent.[1] Tenn. Code Ann. § 36-6-402(5) (2003); *Niceley v. Niceley*, No. M2001-02182-COA-R3-CV, 2003 Tenn. App. LEXIS 214, at *12 (Tenn. Ct. App. Mar. 14, 2003). In creating the residential schedule, the trial court is instructed to evaluate certain enumerated factors. Tenn Code Ann. § 36-6-404(b) (2003). "These factors incorporate those set out in Tenn. Code Ann. § 36-6-106 (the statute which previously guided the trial court in custody determinations) as well as factors established by the courts." *Niceley*, 2003 Tenn. App. LEXIS 214, at *15–16.

In every custody determination undertaken by a trial court, the best interest of the child must be the paramount concern. Tenn. Code Ann. § 36-6-106(a) (2003). To that end, this court adopted a "comparative fitness" approach to guide trial courts in making custody determinations under a best interest analysis, stating:

> [The best interest of the child] is and must remain the true test for the award of custody. To arrive at the point of deciding with whom to place a child in preparation for a caring and productive adult life requires consideration of many relevant factors, *including but certainly not limited to the age, habits, mental and emotional make-up of the child and those parties competing for custody*; the education and experience of those seeking to raise the child; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party seeking custody and *the special requirements of the child*; *the availability and extent of third-party support*; the associations and influences to which the child is most likely to be exposed in the alternatives afforded, both positive and negative; and where is the greater likelihood of an

---

[1] "'Primary residential parent' means the parent with whom the child resides more than fifty percent (50%) of the time[.]" Tenn. Code Ann. § 36-6-402(4) (2003).

> environment for the child of love, warmth, stability, support, consistency, care and concern, and physical and spiritual nurture.

*Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983) (emphasis added). In evaluating the comparative fitness of the parents, a trial court is often confronted with evidence of each parent's frailties. In noting the prevalence of such evidence in divorce and custody cases, we have stated:

> In undertaking this analysis, the courts must understand that parents, whether married or not, are human beings, each with his or her own virtues and vices. *Sherman v. Sherman*, 1994 Tenn. App. LEXIS 660, App. No. 01-A-01-9304-CH-00188, slip op. at 9 (Tenn. Ct. App. Nov. 18, 1994) (No Tenn. R. App. P. 11 application filed). Therefore, the courts should not measure either parent against the standard of perfection. *Bah v. Bah*, 668 S.W.2d at 666; *Edwards v. Edwards*, 501 S.W.2d 283, 290–91 (Tenn. Ct. App. 1973).

*Gaskill*, 936 S.W.2d at 630. The trial court must also consider the following statutory factors:

> (1) The love, affection and emotional ties existing between the parents and the child;
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;
> (4) The stability of the family unit of the parents;
> (5) The mental and physical health of the parents;
> (6) The home, school and community record of the child;
> (7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], relevant to the physical and emotional safety of the child, and determine, by a clear preponderance

of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a) (2003). All of these statutory factors may not be applicable in every case, and the trial judge is only required to consider those factors deemed relevant to the proceeding based on the circumstances. *Burnett v. Burnett*, No. E2002-01614-COA-R3-CV, 2003 Tenn. App. LEXIS 508, at *16 (Tenn. Ct. App. July 23, 2003).

In evaluating a trial court's custody determination, we are mindful of the importance that such decisions have on a minor child.

> Divorce affects children profoundly by undermining their sense of stability and well-being. Thus, custody and visitation arrangements are among the most important decisions confronting a trial court in a divorce case. The needs of the children are paramount; while the desires of the parents are secondary. *Lentz v. Lentz*, 717 S.W.2d 876, 877 (Tenn. 1986). Custody should never be used to punish or reward the parents, *Turner v. Turner*, 919 S.W.2d 340, 346 (Tenn. Ct. App. 1995); *Long v. Long*, 488 S.W.2d 729, 733 (Tenn. Ct. App. 1972), but rather should promote children's best interests by placing them in an environment that will best serve their physical and emotional needs. *See Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983).
>
> No hard and fast rules exist for determining which custody and visitation arrangement will best serve a child's needs. *Taylor v. Taylor*, 849 S.W.2d 319, 327 (Tenn. 1993); *Dantzler v. Dantzler*, 665 S.W.2d 385, 387 (Tenn. Ct. App. 1983). The inquiry is factually driven and requires the courts to carefully weigh numerous considerations. *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990); *Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988).

*Gaskill*, 936 S.W.2d at 630. When the minor child suffers from a mental or physical handicap, the process by which the trial court reaches its custody determination takes on even greater significance. *See Sanborn v. Sanborn*, No. M2003-00418-COA-R3-CV, 2004 Tenn. App. LEXIS 316, at *16–17 (Tenn. Ct. App. May 11, 2004); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484–85 (Tenn. Ct. App. 1997).

Following the hearings conducted in this matter, the chancellor addressed the parties in open court on the record. Regarding the issue of child custody, the chancellor made the following findings:

> First off, as far as the divorce, I'm going to declare the parties to be divorced per the statute. I think there's enough blame to go around in this matter. Obviously the wife's actions at some point became quite bizarre, and for accusations, went beyond the limit. I'm not going to say that there's not some basis for that, but those accusations were out of line. The husband denies that anything was going on, but I do find some — he had some credibility problems before the Court as to whether they are believable, which is not to say that he had affairs with all of these women, but there's something — and I don't think he did, but I do think there was something going on to upset Ms. Mueller. Also, I think the husband was calling the wife these ugly names and talking ugly to her prior to this matter, so I find that there is enough actions on the part of each party to declare the parties divorced and just hope that things will settle down, and when it comes to the child, that they'll be able to work on that.
> . . . .
> The most important matter in this case is [Daughter]. We know that she is a special needs child. She is a very loving child, and to her credit and to the parties — all the credit of the mother and father and the grandparents, they have allowed her to love everyone that she wants to. . . .
> 36-6-106 says the items that I am supposed to consider in determining who should be the primary residential parent, and we have — I've already discussed love, affection, emotional ties. This is one of the strongest cases I've ever seen — where everybody loves this child that deals with her. Both parties can provide her with food, clothing, medical care, the education. We know we have Mrs. Francis Mueller, and the degree that a person has been a primary caregiver, and on this, I find that Ms. Mueller has been the primary resident — the primary caregiver. Both parties can provide a stable and satisfactory environment for her. I realize that Ms. Mueller had this episode for a period of time, but I think — and I do believe strongly that that's over with. Once these parties are separated and

they've been able to live apart, I think that's helped, without question helped her, and I don't think she has these problems towards [Daughter] that — I know she didn't know she had the problems toward [Daughter] that she has toward Mr. Mueller. Both families I think are stable of what they can do. I believe Ms. Mueller's mental health has leveled out and it's fine. The physical health of both the parties is good. The home and community record of the child is good. The school record is wonderful, and I think that's because of Mrs. Mueller. There are going to be bumps in that road, and in all — and in her community record and in her social record as things progress, but I believe that if you all work together, you'll be able to deal with that. I did not talk to [Daughter] about her preference. There is absolutely no physical or emotional abuse to the child. The character and behavior of these people when it comes to dealing with [Daughter] and what is best for her, this is — you are just commendable on that. I think that both parties have past and future potential for — excuse me, the past and potential for future performance is good, and I think you're both willing to work with each other. I know that there's tension there, but I think that will work itself out as things go along. The overriding factor for me was I felt that Ms. Mueller had been the primary caregiver, and I'm going to allow her to be the primary residential parent with certain caveats.

I want joint decision-making here, and also I'm going to allow Mrs. Francis Mueller to continue to tutor this child. I think the proof is overwhelming that Mrs. Mueller has worked with her, and she is the one [Daughter] looks to, and I think to stop that would be extremely detrimental to [Daughter] and to her schoolwork. I believe sincerely that when Mrs. Francis Mueller has — is starting to look — feel badly about herself because of her grades, that's true, and that may be hearsay, but that is something that if you know children as [Daughter] and you look to these grades, you know that's coming. When they don't make good grades, you know it's coming, and you've got to work on her self-image, and that will be helped when she starts to do better in school.

I want to express that the mother is the mother, and the father is the father. You are the primary parents. You are the parents, not primary. You are the only parents she has. We cannot rule out the good effects that Mrs. Muelller, Mrs. Francis Mueller, has had on this child, but I'd have to say to Mrs. Mueller, she is the grandmother, and her job as far as I see it is to be a grandmother. She has an extra job tutoring her, and she is going to have to talk to the school, and I know you realize, both of you, she's got to do that. You all have to be able to talk to the school officials. I mean, you've seen what's happened

when you don't, so you're all — you're going to have to let her do that. You take the steps to do that, but Mrs. Mueller is the grandmother, and the mother and father have primary responsibility, and they're the ones to make decisions, and not that Mrs. Mueller, Mrs. Francis Mueller, cannot give her input. There are going to be some things you're going to need her on, but also I'm not going — I'm going to make — [Daughter] is going to continue to go to Mrs. Francis Mueller for tutoring.

. . . .

I'm not sure how you're going to work with the school. You are all — Mrs. Mueller I'm going to put as far as communicating with the schools on the same level as a parent.

In arguing that the chancery court erred in designating Wife the primary residential parent, Husband has dissected the statutory factors found in section 36-6-106 in an attempt to demonstrate how the evidence preponderates in his favor. Both parties are in agreement that the first factor found in section 36-6-106(a)(1) is not in controversy since both Husband and Wife demonstrate love and affection for Daughter.

Husband's first major area of contention focuses on the statutory factors found in sections 36-6-106(a)(2), (3), and (6). As indicated above, these factors direct a trial court to consider each parents ability to provide for the child's physical and educational needs, the extent to which one parent has been a primary caregiver, the continuity and stability each parent can offer the child, and the child's home and school record. Tenn. Code Ann. § 36-6-106(a)(2),(3),(6) (2003). Husband directs our attention to the fact that after Wife filed for divorce and obtained temporary custody over Daughter, the child has not performed well academically.

Over the course of the hearings conducted in this matter, the chancellor heard testimony from several individuals who have interacted with Daughter over the last several years. Daughter's special education teachers and a representative from the Boling Center explained to the chancellor that stability is crucial to the development of a child with Daughter's disability. Several of these witnesses testified that Grandmother was their primary contact regarding Daughter's academic development, and the evidence showed that Grandmother's tutoring was very beneficial to Daughter. However, the chancellor also heard evidence demonstrating that Wife was very involved in Daughter's school activities and attended school meetings to discuss Daughter's academic development. The evidence also showed that Husband, by his own admission, was rarely, if ever, involved with Daughter's school activities. This fact was supported by the testimony of Daughter's teachers. In addition, the proof established that during the marriage Wife was the primary caretaker of Daughter, looking after her needs in the afternoon while Husband was at work.

The second area of contention raised by Husband centers around the chancellor's application of the factors found in section 36-6-106(a)(4) and (5). These factors direct the court to focus upon

the stability of the family unit, as well as the mental and physical health of the parents. Tenn. Code Ann. § 36-6-106(a)(4)–(5) (2003).

Regarding family stability, the record supports the trial court's finding that Wife offers a more stable family environment. The proof at trial showed that Husband works a rotating shift, and was assigned to the afternoon shift at the time this case came to be heard below. Husband admitted that his work schedule is subject to change, and that he would continue to work the afternoon shift until he was reassigned. Since being reassigned to a correctional facility in Memphis, Husband has also incurred additional driving time in getting to and from work each day. In addition, Husband's attempt to argue that he can provide better educational stability for Daughter by providing better access to tutoring sessions with Grandmother is also thwarted by the evidence contained in the record. In the findings issued by the trial court, the chancellor clearly stated that, even though Mother would be the primary caretaker, the tutoring sessions with Grandmother were to continue.

The trial court also heard evidence regarding the mental state of each party. "[I]t is clear that both the legislature and the courts have recognized that the mental health of a parent is a factor to be considered in making a custody determination." *State v. Howard*, No. E2000-02072-COA-R3-CV, 2001 Tenn. App. LEXIS 697, at *3 (Tenn. Ct. App. Sept. 20, 2001). Father asserts that the evidence presented at trial demonstrates a clear pattern of Wife's deteriorating mental stability warranting a reversal of the chancellor's ruling. The record reveals that Wife visited one therapist who diagnosed her as having obsessive-compulsive disorder. The record also reveals that Wife has also been to see several other therapists for depression. Ms. Meryl Rice was one of the therapists who evaluated Wife. She testified that Grandmother called her office and said Wife needed help. On the first visit, Grandmother brought Wife to Ms. Rice's office and sat in during the session. Ms. Rice was able to evaluate Wife over the course of approximately fifteen office visits. During the course of their relationship, Ms. Rice was able to observe Wife and Daughter interact, and stated that they appeared to be well bonded. Ms. Rice diagnosed Wife as having adjustment disorder with anxiety and depression, but did not feel that this impaired Wife's ability to parent Daughter. The therapist also stated that she did not believe Wife suffered from obsessive-compulsive disorder when she evaluated her.

As additional proof of Wife's deteriorating mental stability, Husband points out that Wife blamed Grandmother for the parties' marital difficulties, was forced to resign from her job, and she cashed Daughter's $500.00 savings bond by forging his signature. Betti Burton, one of the women Wife accused of having an affair with Husband, testified that Wife repeatedly called her at work and harassed her. Stacy Alexander, Husband's co-worker, testified concerning the assault charge she filed against Wife. The court also heard testimony, however, which tended to show that Wife's concerns about Husband's infidelity were well founded. Carolyn Tatum, personnel manager at the correctional facility where Husband used to work, testified concerning charges lodged against Husband by his employer for inappropriate sexual conduct with a co-worker. Ms. Alexander was the co-worker identified as being involved in that incident.

The chancellor also heard Wife's testimony that Husband had a gambling problem. Two witnesses testified that Husband verbally abused Wife, and one of these witnesses testified that this occurred in front of Daughter. Wife took Daughter to see Martha Williams, a therapist, in order to help Daughter understand and deal with the divorce. Ms. Williams testified that she conducted individual therapy with Daughter. Ms. Williams stated that during one of their sessions, Daughter told her that she was upset that Husband was calling Wife names in front of Daughter.

While the court did state that Wife's behavior was "quite bizarre," the court also found that the evidence showed Husband was engaging in conduct that upset Wife. The chancellor also found Husband was not credible in some respects. We give the chancellor's observations in this regard great weight. *Rice v. Rice*, 983 S.W.2d 680, 682 (Tenn. Ct. App. 1998). The chancellor found that Wife's behavior during the divorce had leveled off, and that Wife could provide a stable environment for Daughter. We do not dispute that Grandmother has taken an active, and rather commendable, role in this child's life. As the chancellor correctly noted, however, the legislature instructs the courts of this state to evaluate the evidence presented in order to determine which *parent* should be designated the primary residential parent. Tenn. Code Ann. § 36-6-404(b) (2003); Tenn. Code Ann. § 36-6-106(a) (2003). Our review of the record reveals that the evidence before the trial court does not preponderate against the finding that Wife should be Daughter's primary residential parent.

**Rehabilitative Alimony**

On appeal, Husband argues that the trial court erred in awarding Wife rehabilitative alimony for a period of three years. Husband's main argument on appeal is that Wife voluntarily quit her job after twelve years and has remained unemployed since the final decree was entered.

Trial courts are vested with a considerable amount of discretion when awarding alimony. *Crabtree v. Crabtree*, 16 S.W.3d 356, 358 (Tenn. 2000); *Lancaster v. Lancaster*, 671 S.W.2d 501, 502 (Tenn. Ct. App. 1984). "Appellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes." *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998).

Our legislature has expressed a preference for rehabilitative alimony by stating:

> It is the intent of the general assembly that a spouse who is economically disadvantaged relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse,

considering the relevant statutory factors and the equities between the
parties.

Tenn. Code Ann. § 36-5-101(d)(1)(C) (2003); *see also Crabtree*, 16 S.W.3d at 360. "The purpose
of rehabilitative support is to enable the disadvantaged spouse to acquire additional job skills,
education, or training that will enable him or her to be more self-sufficient." *Anderton*, 988 S.W.2d
at 682. In determining the extent and nature of spousal support, a trial court must consider the
following criteria provided by the legislature:

> (i) The relative earning capacity, obligations, needs, and financial
> resources of each party including income from pension, profit sharing
> or retirement plans and all other sources;
> (ii) The relative education and training of each party, the ability and
> opportunity of each party to secure such education and training, and
> the necessity of a party to secure further education and training to
> improve such party's earning capacity to a reasonable level;
> (iii) The duration of the marriage;
> (iv) The age and mental condition of each party;
> (v) The physical condition of each party, including, but not limited to,
> physical disability or incapacity due to a chronic debilitating disease;
> (vi) The extent to which it would be undesirable for a party to seek
> employment outside the home because such party will be custodian
> of a minor child of the marriage;
> (vii) The separate assets of each party, both real and personal,
> tangible and intangible;
> (viii) The provisions made with regard to the marital property as
> defined in § 36-4-121;
> (ix) The standard of living of the parties established during the
> marriage;
> (x) The extent to which each party has made such tangible and
> intangible contributions to the marriage as monetary and homemaker
> contributions, and tangible and intangible contributions by a party to
> the education, training or increased earning power of the other party;
> (xi) The relative fault of the parties in cases where the court, in its
> discretion, deems it appropriate to do so; and
> (xii) Such other factors, including the tax consequences to each party,
> as are necessary to consider the equities between the parties.

Tenn. Code. Ann. § 36-5-101(d)(1)(E) (2003). "[A] trial court must consider every relevant factor
in § 36-5-101(d)(1) to determine the nature and extent of support, which includes the decision to
award rehabilitative alimony." *Robertson v. Robertson*, 76 S.W.3d 337, 340 (Tenn. 2002); *see also
Bratton v. Bratton*, 136 S.W.3d 595, 604 (Tenn. 2004). These enumerated factors "must be

considered on a case-by-case basis to determine the nature and extent of support." *Robertson*, 76 S.W.3d at 341.

While addressing the parties concerning child custody, the chancellor also made the following findings regarding alimony:

> The wife has asked for alimony on a periodic basis, and I find that rehabilitative alimony is appropriate in this case. If you look in the statute at 36-5-101, "Rehabilitative maintenance and support is a separate class of spousal support as distinguished from alimony in solido and periodic alimony in determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term and the matter of payment, the Court shall consider all the relevant factors including the relative earning capacity, obligation needs and financial resources of a party, including income from pension, profit sharing, retirement plans and other sources, the relative education and training of a party, the ability, opportunity of each party to secure such education and training, the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level, the duration of the marriage, the age and mental condition of each party, the physical condition of each party, including but not limited to physical disability and incapacity, future or chronic debilitating illness." There's no chronic debilitating illness here. ". . . the extent to which it would be desirable for a party to seek employment outside the home because such party will be the custodian of a minor child of the marriage, the separate assets of a party, the provisions made regarding the marital property, the living standards of the party, the extent to which each party has such tangible and intangible contributions," et cetera. I can consider the relative fault of the party and other factors such as tax consequences. When I get to the bottom line, you still look to the need of one party and the ability to pay.
>
> Ms. Mueller has been without a job for about a year. I agree with Mr. Cartwright when he says just because she doesn't have a job now does not mean she hasn't looked. Times are difficult here. It's difficult to get a job. I think it may be difficult in Lauderdale County for Ms. Mueller to get a job. She's going to have to go into Dyer, Tipton, Shelby, Madison. I'm not sure exactly where, but I think she's going to have difficulty here, and she's going to have to get one, and, therefore, I think that because she needs to do something about this and also because she has said that she wants to go to school, I do not want her — I'm not going to let her take off full time to go to

-14-

school, but I am going to give some money where she should be able, I hope — it's my intention that she should be able to live and still save some money up to go to school by the time Laura is older.

I am going to have three years of rehabilitative alimony beginning October 1 of '03, and for 12 months alimony will be 550 a month; beginning October 1, '04 for 12 months, 350 a month; beginning October 1, '05, 250 a month. I think she needs this, number one, to meet her needs right now until she gets a job, and also I think this money will be money that she can save to go to school when it's time for her to go. She is not where she can make the money that the husband is able to make, and that should be able to help her, help her get some training to increase her skills.

Again, I admonish her that she needs to spend full time while [Daughter's] in school working full time to get a job.

We first address whether Wife was economically disadvantaged in comparison to Husband at the time of the divorce. Tenn. Code Ann. § 36-5-101(d)(1)(C) (2003); *see also Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003). Wife submitted an affidavit to the chancery court showing her monthly expenses to be $2,021.44. Wife had been unemployed, albeit voluntarily, for almost a full year when the final divorce decree was entered. Husband remained employed at the time of the divorce making $45,657.75 per year. In support of his assertion that rehabilitative alimony is not warranted in this case, Husband directs our attention to the fact that Wife had previously earned $26,000 per year before she voluntarily decided to quit her job.

Contrary to Husband's position, Wife's unemployment at the time of the divorce was not entirely voluntarily. The record reveals that Wife was given the option of voluntarily quitting her job or face certain termination. The chancellor found that Wife's behavior leading up to her job loss was due in part to Husband's behavior, and we find nothing in the record which preponderates against that finding. The chancellor also found that Wife made efforts at securing other employment, but was unsuccessful. "As with any award of spousal support, the two most important factors considered are the need of the disadvantaged spouse and the obligor spouse's ability to pay." *Robertson*, 76 S.W.3d at 342. We find that the evidence supports the chancellor's determination that Wife was economically disadvantaged.

"Once a trial court has found a party to be economically disadvantaged relative to his or her spouse, it must determine the nature, amount, length of term, and manner of payment of the award." *Perry*, 114 S.W.3d at 467. Wife was forty-three years of age and Husband was forty-nine years of age at the time of their divorce. The parties' marriage lasted for fifteen years. Husband, in his brief, concedes that both parties are in good health and that neither party suffered from a mental disability.[2]

---

[2] This appears to directly contradict Husband's earlier arguments regarding the trial court's determination that Wife should be the primary residential parent. The mental health of the parties is a factor that the trial court must

(continued...)

Both Husband and Wife have completed two years of college. Husband has been employed at the same job for the past thirty years where he amassed $63,184.80 in his retirement account. Over the twelve years that Wife was employed, she amassed approximately $5,000 in retirement savings. Wife testified that she cashed out her retirement account, subject to an IRS penalty, which she used to pay rent and expenses when she moved out of the marital home. The chancellor ordered Husband to pay the $2,103.35 tax penalty Wife incurred as a result of withdrawing the retirement funds. The court also ordered each party to pay their own credit card debts. Husband received the home in which the parties lived while married, and he is not responsible for any mortgage payments or rent. The trial court also heard proof regarding Husband's gambling income, which, based on the record, appeared to be substantial.

Wife testified that she has applied for a job at several businesses, but she has been unsuccessful. Wife stated that her goal was to continue her education so that she can work in elementary education. The chancellor found that Wife made reasonable efforts to secure employment given the current economic environment. Determining whether Wife did in fact apply to the businesses she indicated in her testimony is largely a question of credibility which we are reluctant to second-guess. *Rice v. Rice*, 983 S.W.2d 680, 682 (Tenn. Ct. App. 1998).

"There are no hard and fast rules for determining the extent of a person's obligation to support a former spouse." *Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989) (citations omitted). "When reviewing a trial court's discretionary decision, appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Overstreet v. Shoney's Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). In addressing the parties, the chancellor quoted from the statutory language in section 36-5-101, noting those factors that were applicable to this case. Having thoroughly reviewed the record and the applicable statutory factors, we conclude that the chancellor did not abuse her discretion in awarding Wife rehabilitative alimony. We have also noted that a portion of Husband's argument on appeal focuses on circumstances that occurred post-trial. If Wife's need for rehabilitative alimony changes in the future, then the trial court continues to have the ability to modify the award. Tenn. Code Ann. § 36-5-101(d)(1)(C) (2003); *Crabtree*, 16 S.W.3d at 360.

### Attorney's Fees on Appeal

On Appeal, Wife has requested that we award her attorney's fees and litigation expenses associated with defending this appeal. In addressing requests for attorney's fees on appeal, we are guided by the following:

---

[2](...continued)
consider when making that determination as well. Tenn. Code Ann. § 36-6-106(a)(5) (2003). In that section of the Appellant's Brief addressing the custody of Daughter, Husband was quick to point out Wife's mental instability. In this instance, however, Husband appears to have taken a different stance regarding Wife's mental state.

> Our supreme court has defined the factors that should be applied when considering a request for attorney's fees incurred on appeal. These factors include the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered.

*Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 Tenn. App. LEXIS 628, at \*26–27 (Tenn. Ct. App. Sept. 3. 2003) (citing *Folk v. Folk*, 357 S.W.2d 828, 829 (Tenn. 1962)). We find it equitable to deny Wife's request for attorney's fees in this case. *See id.*

## Conclusion

For the foregoing reasons, we affirm the decisions of the chancery court relating to child custody and alimony. Costs on appeal are taxed to the Appellant, David Edmond Mueller, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE